UNITED STATES, Appellee

V.

Shannon R. BULLMAN, Captain
U.S. Air Force, Appellant

No. 01-0647

Crim. App. No. 34403

---

United States Court of Appeals for the Armed Forces

Argued November 28, 2001

Decided March 26, 2002

GIERKE, J., delivered the opinion of the Court, in which
EFFRON and BAKER, JJ., joined.  CRAWFORD, C.J., and
SULLIVAN, S.J., each filed a dissenting opinion.

Counsel

For Appellant:  Lieutenant Colonel Timothy W. Murphy (argued);
Lieutenant Colonel Beverly B. Knott, Captain Patrick J.
Dolan, and Captain Patience E. Schermer (on brief).

For Appellee:  Major Jennifer R. Rider (argued); Colonel Anthony
P. Dattilo and Major Lance B. Sigmon (on brief).

Military Judge:  Michael A. Kilroy


**This opinion is subject to editorial correction before final publication.**

Judge GIERKE delivered the opinion of the Court.

A general court-martial convicted appellant, pursuant to his pleas, of attempting to use a government credit card for personal use, using a government credit card for personal use, four specifications of dishonorably failing to maintain sufficient funds in his bank for payment of checks or drafts, and dishonorable failure to pay a debt to the Army and Air Force Exchange Service (AAFES), in violation of Articles 80, 92, and 134, Uniform Code of Military Justice, 10 USC §§ 880, 892, and 934, respectively. The adjudged and approved sentence provides for a dismissal from the service. The Court of Criminal Appeals affirmed in an unpublished opinion.

We granted review of the following issue specified by the Court:

> WHETHER APPELLANT'S PLEA OF GUILTY TO SPECIFICATION 1 OF CHARGE III (DISHONORABLE FAILURE TO PAY A JUST DEBT) WAS IMPROVIDENT.

We hold that the plea of guilty was improvident.

## The Guilty Plea Inquiry

The granted issue in this case involves appellant's failure to make timely payments on his Deferred Payment Plan (DPP) account with AAFES. The military judge advised appellant of the elements of the offense as follows:

> First, that you were indebted to the Army and Air Force Exchange Service in the sum of $428.45 for charges made on a deferred payment plan.
>
> Second, that this debt became due and payable on or about the 9th of October of 1999.
>
> Three, that at or near Osan Air Base, Republic of Korea, from about the 9th of October 1999 to about the 8th of December of 1999, while the debt was still due and payable, you dishonorably failed to pay the debt.

2

> And, four, that under the circumstances your conduct was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

The military judge did not define "dishonorable" as it applied to appellant's failure to pay the AAFES debt. He had defined "dishonorable" as it applied to the bad checks,[1] but he did not advise appellant whether the same definition applied to the AAFES debt.

A stipulation of fact recites the following regarding the AAFES debt:

> 7.  Between 9 October and 8 December 1999, the Accused failed to pay a just debt to AAFES for charges he made on his Deferred Payment Plan (DPP) in the amount of $428.45. He did not make the payments because his prior bad checks had resulted in garnishments of his pay such that he could not make the DPP payments; he further did not attempt to work out an acceptable payment plan with AAFES. His failure to pay was dishonorable and was prejudicial to good order and discipline in the armed forces. Further, it was of a nature to bring discredit on the armed forces in that it had a tendency to diminish the esteem with which the Air Force is viewed by employees of AAFES and by others who might hear of his actions.[2]
>
> 8.  The Accused's checking account at Eisenhower National Bank was credited $1,185.06 on 1 July 1999, which was the amount to which the Accused was entitled after his income tax, other deductions, and voluntary bank allotments were taken from his pay. As a result of recoupment actions initiated in June 1999 to pay other outstanding debts, he received $281.03 on 15 July 1999 and $281.01 on 30 July 1999. As a result of another recoupment action initiated in July 1999, he was paid $828.03 on August 13, 1999. His Eisenhower

---

[1] During the inquiry into appellant's pleas of guilty to the bad-check offenses, the military judge advised him that the term "dishonorable" means "a failure which is fraudulent, deceitful, a willful evasion, made in bad faith, deliberate, based on false promises, or which indicates a grossly indifferent attitude towards the status of one's bank account and that person's just obligations."

[2] These two sentences regarding dishonorable conduct, prejudice to good order and discipline, and discredit on the armed forces are repeated in the stipulation of fact for each of the bad-check offenses, as well as the failure to pay the debt to AAFES.

National Bank account was debited $367.36 on 15 July and 16 August 1999 to cover the Accused's loan from the bank, and it was debited $21.95 on 6 July 1999 and 16 August 1999 to pay for his account with America Online.

9. The Accused borrowed money from his relatives and used some of his own pay to made [sic] deposits of $1060.00, $1000.00, $800.00 and $800.00 to the Osan Community Bank on 2 November 1999, 5 November 1999, 30 December 1999 and 1 February 2000, respectively. During this period, the Accused received a loan from the Air Force Aid Society to help him with his expenses. He brought [the] Community Bank account to a positive balance on 1 February 2000, when he closed his account there. Between 25 August 1999 and 7 March 2000, AAFES took amounts between $600.00 and $1896.00 from the Accused's net monthly pay, which averaged from $2,400.00 to $2,600.00. These amounts, combined with cash payments to AAFES, were applied until the checks and service fees were repaid and his DPP card was current.

The military judge questioned appellant about his plea of guilty to this offense as follows:

MJ: Lets talk about Specification 1 of Charge III. Why don't you tell me what happened on that?

ACC: Charge III, Specification 1, I owed a debt of $428.45 to the Army, Air Force Exchange Service for charges made on my deferred payment plan. The sum became due on 9 October 1999, and from 9 October 1999 to 8 December 1999 I dishonorably failed to pay this amount of money to AAFES. My failure to pay this bill was of a nature to bring discredit upon the armed forces [in] that it had a tendency to diminish the esteem with which the Air Force is viewed by employees of AAFES and others who might hear of my actions.[3]

MJ: Now, apparently your bill with DPP was due somewhere around the 9th of each month is –

ACC: The 8th, yes, sir.

MJ: So, each month, at least beginning with the 9th of October you had a debt with AAFES under your deferred payment plan for $428.00?

ACC: Yes, sir, approximately.

[3] The last sentence of this response is virtually identical to appellant's response regarding each of the bad-check offenses and is virtually identical to the language of the stipulation of fact.

MJ:  And, you knew that you had that debt?

ACC:  Yes, sir.

MJ:  And, you knew that you had to make payments on a monthly basis?

ACC:  Yes, sir.

MJ:  Did you make any payments between the 9th of October of last year and the 8th of December of last year to AAFES to cover this payment plan?

ACC:  No, sir.  At the time, because of the fact of my gross indifference with the situations [sic] prior charges, I did not have any money in my account coming in to be able to pay that debt.

MJ:  Well, did you try to pay it with anything other than the Eisenhower National Bank?

ACC:  No, sir.  I had no cash on hand.

MJ:  Did you make any arrangements or even talk with people at AAFES about the debt?

[The Accused consulted with his defense attorneys.]

ACC:  When I had went [sic] over to Air Force Aide [sic] to get money for them to help, Kermit Basel from the Family Support Center had called AAFES for me with me sitting there, and they said that they had already initiated garnishment on my account because the payments were so far past due.  But, other than that, no, sir.

MJ:  When did that take place?

ACC:  Sometime in November.

MJ:  And, did, in fact, some kind of garnishment action take place where they were taking money out of your account?

ACC:  Yes, sir.

MJ:  But apparently it wasn't enough to pay it until sometime after the 8th of December?

ACC:  Total, yes, sir, because of the amount of money that was coming out of my paycheck for the garnishment and the allotment I had made to Community Bank.  AAFES, in November and December took out almost $1,900.00 out of my pay in conjunction with the $800.00.  I was doing

5

an allotment to Community Bank where my pay in November for the 15th and the 1st of December was approximately $250.00 each paycheck, and then December was approximately $300.00 for the 15th and my 1 January paycheck was a dime.

MJ: But, of all the money that AAFES was taking out, not all of that was going towards this debt under the payment plan, it was going towards the other checks as well—

ACC: It was going for the checks, for the service fees and for the DPP.

MJ: Recognizing that they were doing what's called an involuntary action on your part in taking the money out of your account, you did nothing other than that though in an attempt to pay the deferment?

ACC: No, sir, not until February.

MJ: Was there anything other than the obvious lack of money to prohibit you from working with AAFES to try to work out some sort of an arrangement—

ACC: No, sir. If I would have had the cash, I would have made the payments.

Unlike his inquiry into the bad-check offenses, the military judge did not further inquire why appellant believed that his failure to pay the AAFES debt was dishonorable.[4]

## Discussion

Appellant contends that his plea of guilty was improvident because the military judge failed to define "dishonorable" conduct, failed to elicit facts from appellant to establish that his conduct was dishonorable, and failed to resolve inconsistencies between appellant's statements and his guilty plea. Final Brief at 7. The Government argues that the record

---

[4] In the stipulation of fact, appellant admitted that the bad checks were the result of his "gross indifference to his financial obligations." During the plea inquiry, appellant told the military judge that he was grossly indifferent to the status of his checking account balance because he did not keep a check register but "attempted to do so in [his] head."

as a whole reflects that appellant knew the elements of the offense and admitted them, and that there is a factual basis for the plea.  Answer to Final Brief at 1, 8.

Article 45(a), UCMJ, 10 USC § 845(a), provides:

> If an accused . . . after a plea of guilty sets up matter inconsistent with the plea, or if it appears that he has entered the plea of guilty improvidently or through lack of understanding of its meaning and effect, . . . a plea of not guilty shall be entered in the record, and the court shall proceed as though he had pleaded not guilty.

RCM 910(c), Manual for Courts-Martial, United States (2000 ed.) requires the military judge to inform the accused of the nature of the offense to which the guilty plea is offered.  The rule implements United States v. Care, 18 USCMA 535, 541, 40 CMR 247, 253 (1969), requiring the military judge to question an accused "about what he did or did not do, and what he intended (where this is pertinent), to make clear the basis for a determination by the military trial judge . . . whether the acts or the omissions of the accused constitute the offense . . . to which he is pleading guilty."  See also United States v. Faircloth, 45 MJ 172, 174 (1996).

RCM 910(e) requires the military judge to make "such inquiry of the accused as shall satisfy the military judge that there is a factual basis for the plea."  This rule implements United States v. Davenport, 9 MJ 364, 367 (CMA 1980), requiring that "the factual circumstances as revealed by the accused himself objectively support that plea [of guilty.]"  It is not enough to elicit legal conclusions.  The military judge must elicit facts from which the military judge can determine the factual basis for the plea.  See United States v. Outhier, 45 MJ 326, 331 (1996).

A mere possibility of a defense does not render a plea of guilty improvident. United States v. Prater, 32 MJ 433, 436 (CMA 1991). On appeal, a guilty plea should be overturned only if the record fails to objectively support the plea or there is "evidence in 'substantial conflict' with the pleas of guilty." See United States v. Higgins, 40 MJ 67, 68 (CMA 1994). In deciding whether a plea is rendered improvident by statements inconsistent with the plea, the sole question is whether the statement was inconsistent, not whether it was credible or plausible. United States v. Lee, 16 MJ 278, 281 (CMA 1983).

A mere failure to pay a debt does not establish dishonorable conduct. United States v. Gardner, 35 MJ 300, 301 (CMA 1992). Even a negligent failure to pay a debt is not "dishonorable." United States v. Kirksey, 6 USCMA 556, 560, 20 CMR 272, 276 (1955). In United States v. Downard, 6 USCMA 538, 542, 20 CMR 254, 258 (1955), this Court observed that "the term 'dishonorable' connotes a state of mind amounting to gross indifference or bad faith," and that "simple negligence alone will not suffice." This Court concluded:

> Thus, the offense of dishonorable neglect to discharge pecuniary obligations contemplated that the failure to pay be characterized by deceit, evasion, false promises, denial of indebtedness, or other distinctly culpable circumstances.

Id. at 543, 20 CMR at 259.

These judicial definitions of dishonorable conduct are encapsulated in paragraph 71c, Part IV, Manual, supra, as follows:

> More than negligence in nonpayment is necessary. The failure to pay must be characterized by deceit, evasion, false promises, or other distinctly culpable

8

> circumstances indicating a deliberate nonpayment or grossly indifferent attitude toward one's just obligations.

In United States v. Schneiderman, 12 USCMA 494, 31 CMR 80 (1961), this Court held the following statement in extenuation and mitigation was inconsistent with a plea of guilty to dishonorable failure to pay debts:

> [T]hat [appellant] overextended himself because of the easy credit terms made available to members of the naval service; that he tried to keep up his payments; that he was unable to do so; that he was required by a military order to pay off debts to other personnel; and, finally, that he had written his creditors and made satisfactory arrangements with them to liquidate his indebtedness.

This Court held:

> The entire tenor of the declaration is inconsistent with any idea that accused's failure to pay his creditors was fraudulent, deceitful, or evasive.  Not only does it clearly depict that his nonfeasance was predicated upon an inability to pay, but it concludes with the statement that satisfactory arrangements had been made with his creditors.  Both these factors are at odds with the allegation of dishonorable conduct to which he pleaded guilty.

Id. at 496, 31 CMR at 82 (emphasis added).

In United States v. Hilton, 39 MJ 97, 100 (CMA 1994), this Court recognized that financial inability to pay must be considered in determining whether failure to pay a debt is dishonorable.  In Hilton, this Court found a guilty plea provident because, although the appellant asserted that she was unable to pay the debt, she admitted that she was receiving her full military pay of $724.20 per month, that the amount due was only $50.00, and that she deliberately avoided her creditors. Id. at 101.

Similarly, in United States v. Bester, 42 MJ 75, 77-78 (1995), this Court found a guilty plea provident, even though the appellant asserted inability to pay a debt. However, in Bester, the military judge elicited admissions from the accused that his military pay was stopped because he was absent without authority, that he was physically able to find work and pay the debt but did not do so, and that he deceived his creditor about the reasons for nonpayment.

Applying these precedents to appellant's three-pronged attack on the providence of his guilty plea, we conclude that the plea is improvident. We agree with appellant that the military judge did not define the term "dishonorable" during his inquiry into the plea of guilty to dishonorably failing to pay the AAFES debt. The military judge did not mention the term as it applied to the debt, nor did he tell appellant whether the term as applied to the bad checks had the same meaning when applied to the debt.

We also agree with appellant's claim that the military judge did not elicit a sufficient factual predicate for the guilty plea to dishonorably failing to pay the AAFES debt. Although appellant told the military judge he believed he was grossly indifferent to his various checking accounts because he did not keep a written check register, there is nothing in the plea inquiry showing why appellant believed that his conduct regarding the AAFES debt was "characterized by deceit, evasion, false promises, or other distinctly culpable circumstances indicating a deliberate nonpayment or grossly indifferent attitude." Para. 71c, Part IV, Manual, supra.

Rather than elicit facts about appellant's efforts to pay the debt, the military judge elicited only legal conclusions, in which appellant repeated verbatim the conclusions in the written stipulation of fact, to wit: "I dishonorably failed to pay this amount of money to AAFES. My failure to pay this bill was of a nature to bring discredit upon the armed forces [in] that it had a tendency to diminish the esteem with which the Air Force is viewed by employees of AAFES and others who might hear of my actions." We hold that this rote recitation of the elements of the offense was inadequate. See United States v. Outhier, supra.

Finally, we agree that appellant made statements and stipulated to facts inconsistent with dishonorable conduct. The most obvious is appellant's assertion, "If I would have had the cash, I would have made the payments." The stipulation of fact shows that appellant's difficulties with his checking accounts began in April of 1997, two-and-a-half years before the first AAFES debt was overdue.[5] The record also shows that appellant borrowed money from relatives and from the Air Force Aid Society. The record further shows that a representative of the base family support center contacted AAFES on appellant's behalf regarding the possibility of making voluntary arrangements to pay the debt. Appellant's representative was informed that AAFES had already initiated involuntary pay withholding from appellant's monthly pay, thereby preempting any voluntary arrangement. Finally, the stipulation recites that, even while AAFES was making involuntary

---

[5] In his unsworn statement during the sentencing hearing, appellant stated that his financial difficulties began in April 1997, when he assumed almost $49,000 in credit card debt as a result of a divorce.

collections from appellant's pay, he made additional cash payments to AAFES. All arrears were paid and the account was current by the time of appellant's court-martial. These facts are inconsistent with dishonorable conduct.

The facts in this case are strikingly similar to those in Schneiderman, supra, except for the existence of a mutually agreeable payment plan, which was preempted by AAFES's actions in this case. This record is significantly different from the records in Hilton and Bester, supra. Unlike the Hilton record, this record shows that garnishments and the AAFES involuntary collections substantially reduced appellant's military pay. During the plea inquiry, appellant told the military judge that AAFES withheld "almost $1900" from his pay in November and December. He received only about $250 on November 15 and December 1, $300 on December 15, and ten cents on January 1. Unlike the Hilton and Bester records, this record shows that appellant dealt forthrightly with AAFES officials and did not attempt to deceive or avoid them. To the contrary, his representative contacted AAFES about the possibility of voluntary repayment. Unlike the Hilton and Bester records, this record shows that appellant borrowed money to pay AAFES. Finally, unlike the Hilton and Bester records, this record shows that appellant made voluntary payments, even while AAFES was making involuntary collections.

Because the military judge failed to define dishonorable conduct with respect to the AAFES debt, failed to elicit a factual predicate for dishonorable conduct regarding the debt,

and failed to resolve the inconsistencies between appellant's responses and his guilty plea, we hold that appellant's guilty plea to this offense was improvident.

## Decision

The decision of the United States Air Force Court of Criminal Appeals is reversed as to specification 1 of Charge III and as to sentence, but is affirmed in all other respects. The finding of guilty of specification 1 of Charge III and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force for remand to the Court of Criminal Appeals. That court may either dismiss specification 1 of Charge III and reassess the sentence, or it may order a rehearing.

CRAWFORD, Chief Judge (dissenting):

At the time appellant committed the offenses to which he pled guilty and was convicted, he was a Captain with about seventeen years of service. The record of trial, supported by appellant's own statements, reflects that his fiscal irresponsibility began when he arrived in Korea for an unaccompanied tour. There, he met a "juicy girl," a female hired by a bar to encourage men to purchase drinks. Apparently appellant fell in love with this girl and began to expend large amounts of money to pay "bar fines." A "bar fine" is an amount of money equal to the total sums that a "juicy girl" would earn during an evening of persuading male patrons to purchase drinks. During this courtship (which ended in marriage), appellant wrote and uttered a total of over $14,000 in dishonored checks.

During this same period, appellant purchased items from the Army and Air Force Exchange Service (AAFES), using the deferred payment plan (DPP) as the payment vehicle. The specification to which appellant pled guilty shows that between October 1999 and December 1999, he dishonorably failed to pay AAFES the sum of approximately $428.45.

The stipulation of fact relates that:

> Between 9 October and 8 December 1999, [appellant] failed to pay a just debt to AAFES for charges he made on his Deferred Payment Plan (DPP) in the amount of $428.45. He did not make the

> payments because his prior bad checks
> had resulted in garnishments of his pay
> such that he could not make the DPP
> payments; he further did not attempt to
> work out an acceptable payment plan
> with AAFES.  His failure to pay was
> dishonorable and was prejudicial to
> good order and discipline in the armed
> forces.  Further, it was of a nature to
> bring discredit on the armed forces in
> that it had a tendency to diminish the
> esteem with which the Air Force is
> viewed by employees of AAFES and by
> others who might hear of his actions.

(Emphasis added.)

The discussion of this offense with the military judge, ___ MJ at (4-6), clearly shows that appellant understood the offense to which he was pleading guilty and gave his assent to the accuracy of the stipulation of fact.  See United States v. Vonn, ___ U.S. ___, ___, 122 S.Ct. 1043, 1052-53 (2002)(omission from guilty plea inquiry results in reversal of conviction only when appellant demonstrates his substantial rights were affected, i.e., no automatic reversal when mistake conducting inquiry under Fed.R.Crim.P. 11 does not impact on "the overarching issues of knowledge and voluntariness"); RCM 910(c) and (e), Manual for Courts-Martial, United States (2000 ed.).

The standard of review for determining the providence of a guilty plea is whether there is a substantial conflict raised in the record between appellant's plea of guilty and some inconsistent statement.  See, United States v. Bickley, 50 MJ 93

(1999).  Rejecting a guilty plea "requires that the record of trial show a 'substantial basis' in law and fact for questioning [that] plea."  United States v. Prater, 32 MJ 433, 436 (CMA 1991).

At issue is whether appellant's conduct was "dishonorable," whether appellant understood the definition of "dishonorable" and believed his failure to pay his DPP debt was in fact dishonorable, and whether the inquiry under United States v. Care, 18 USCMA 535, 40 CMR 247 (1969), taken as a whole, supports the guilty plea.  In my opinion, this Court's holdings in United States v. Bester, 42 MJ 75 (1995), and United States v. Hilton, 39 MJ 97 (CMA 1994), are dispositive of appellant's arguments.

The gravamen of appellant's contention, supported by the majority, is that AAFES, not appellant, is at the root of the problem.  In short, appellant was unable to pay his DPP debt because AAFES garnished his salary in order to recoup thousands of dollars in worthless checks appellant had uttered at AAFES.  Appellant's logic reminds me of Flip Wilson's "the devil made me do it" comedy routine.

Our cases and RCM 916(i), Manual for Courts-Martial, United States (2000 ed.), make the defense of inability to pay available only if the accused can show:

3

1.   An extrinsic factor(s) over which the accused had no control; and

2.   Noncompliance was not due to the fault of the accused after he had an obligation to pay, and the extrinsic factor(s) could not be remedied by the accused's timely legal efforts.

The defense of inability to pay was not available in Bester, nor in Hilton, both supra; nor is it available to appellant.  It was appellant who created his own situation by having more debts than earnings, and he should not be allowed to use a situation of his own making as an excuse to defeat a charge of dishonorable failure to pay just debts.

"If the physical or financial inability of the accused occurred through the accused's own fault or design, [the inability to pay] is not a defense."  RCM 916(i) Discussion.  Therefore, in order for the majority to be correct in its reversal, appellant's inability to pay needed to have been completely out of his hands, and not of his own creation.  Yet, appellant himself stated that his actions were dishonorable based on his gross indifference to his prior financial situation.

"While financial inability by itself may not be a complete defense to a dishonorable failure to pay a just debt, it is a fact to be considered with others in determining whether such a failure was dishonorable....  Such a conclusion stems from well-

established military law that all the facts of the case must be considered in finding dishonor." Hilton, 39 MJ at 100 (citation omitted). In other words, the record must be considered as a whole. Id.

In reading the record as a whole, I am convinced that when appellant pled guilty, he understood the meaning of "dishonorable." Any contention that the military judge failed to define "dishonorable" in the context of appellant's DPP debt is without substance. The record of trial clearly reflects that the military judge informed appellant of the elements of the three specifications under Charge III, and then explained the meaning of various words, to include dishonorable conduct, included within those specifications. There is no requirement for a military judge sua sponte to stop in mid-sentence during a providence inquiry to explain a definition. Furthermore, the Care inquiry, taken as a whole, neither establishes a defense to the crime in question nor reflects any inconsistencies that should have led the military judge to reject the guilty plea.

Accordingly, I would affirm the decision of the Air Force Court of Criminal Appeals.

5

SULLIVAN, Senior Judge (dissenting):

Appellant, a thirty-six-year old Captain with seventeen years of service, pleaded guilty in this case on the advice of competent counsel. He voluntarily entered a plea of guilty and admitted that his repeated failure to make his deferred payment plan payment without personally contacting service Exchange authorities was dishonorable. On appeal before the Court of Criminal Appeals and this Court and, again, with the advice of competent counsel, he made no claim that his guilty plea was invalid. Yet, a majority of this Court on its own granted a specified issue on this question, and now a majority sets aside his guilty plea to the above offense. I think this Court should, like the trial judge and appellate court below, take this experienced and well-advised officer at his word - that he was guilty of the charge of dishonorably failing to pay a just debt.

Turning first to the question of dishonor, or what was dishonorable conduct, I agree with Chief Judge Crawford. The military judge advised appellant what "dishonorable" meant in the context of his discussion of appellant's dishonorable failure to maintain sufficient finds to cover numerous personal checks. He said, "An accused's conduct in maintaining his bank account must have been dishonorable, that is, a failure which is fraudulent, deceitful, a willful evasion, made in bad faith, deliberate, based on false promises, or which indicates a grossly indifferent

attitude towards the status of one's bank account and that person's just obligations." (R.37) The judge used that same term to describe appellant's failure to make three successive monthly payments of $428.45 after he had earlier issued two bad checks to cover his debt to AAFES. (R.47-48, 50-52) See paras. 68c and 71c, Part IV, Manual for Courts-Martial, United States (1998 ed.)(using same definition of dishonor for bad checks and failure-to-pay offenses). There was no confusion in this case on the meaning of dishonor.

Secondly, the majority overlooks portions of this record which overwhelming support appellant's plea of guilty to dishonorably failing to pay a just debt. The record shows that as a lieutenant, appellant divorced his officer wife in 1997 and assumed $49,000 in credit-card debt. He had accumulated that debt with his first wife and was required to make payments of $1600 per month. (R.275, 277)

In September of 1998, appellant was transferred to Osan, Korea, where he met his soon-to-be second wife, L. (R.278) She was a "juicy girl" in a downtown bar, a female employed by a local bar whose job was to encourage men to purchase drinks. (R.279) During his courtship, appellant spent large amounts of money to pay "bar fines," sums equal to the amount of money that she was expected to produce for the bar during the evening by her persuading male companions to drink. (R.285-86) It was these bar

fine payments which caused appellant to write the majority of his dishonored checks and be unable to make his deferred payments to the Exchange when due.

All told, appellant made and uttered a total of $14,906.18 in dishonored checks. About $14,000 of these were uttered within an eleven-month period beginning in November 1998 and ending in September 1999. In late September 1999, appellant discussed his financial situation with his commander and placed himself in the hands of a credit counselor. In October, November, and December of 1999, however, he failed to make payments under a deferred payment program to AAFES without personally contacting that organization. Neither his subsequent attempt to use the Air Force Aid Society as a financial intercessor, nor his later payment of this debt, logically or legally prelude a finding of dishonor.

Thirdly, as to appellant's inability to pay, this Court has held on several occasions that one's financial condition does not excuse this crime where the inability to pay was the product of one's own dereliction. See United States v. Bester, 42 MJ 75 (1995); United States v. Hilton, 39 MJ 97 (CMA 1994). The majority suggests appellant's financial plight resulted from his divorce and assumption of a large credit card debt. However, it is clear from the record as a whole that the financial breakdown which resulted in his nonpayment of his just debts stemmed from

3

his financial efforts to prevent his girlfriend from having to hustle drinks.  Only four of the bad checks in this case were made and uttered prior to appellant's arrival in Korea, and could be logically attributed to his earlier divorce.[*]

Finally, this is not a case like United States v. Schneiderman, 12 USCMA 494, 31 CMR 80 (1961), where the entire tenor of the accused's statement was inconsistent with a finding of dishonor.  Admittedly, appellant did testify that "[he] had no cash on hand," and "that "[i]f [he] would have had the cash, [he] would have made the payments." (R.51-52) Such post-offense speculation, however, does not constitute a defense to a dishonorable failure to pay a just debt.  Moreover, the majority's over-reliance on these self-serving statements to the exclusion of the remainder of the record, which overwhelmingly established appellant's financial arrogance, is certainly not warranted.  Again, I would take appellant at his word and affirm his guilty plea for a dishonorable failure to pay a just debt. See United States v. Harrison, 26 MJ 474 (CMA 1988).

---

[*]  The total amount of these four checks was $1,100.  In addition, appellant made and uttered an additional dishonored check for $300 which, while presented after he arrived in Korea, does not appear to be related to his overall financial downfall.